755 A.2d 1256 (2000)
333 N.J. Super. 511
GLOUCESTER CITY BOARD OF EDUCATION, Plaintiff-Appellant,
v.
AMERICAN ARBITRATION ASSOCIATION, Defendant, and
Amwest Surety Insurance Company, Defendant-Respondent, and
Burris Construction Company, INC., Defendant/Third-PartyPlaintiff,
v.
J & L Plumbing & Heating, Inc., t/a J & L Associates, Inc., and Worth & Company, Inc., Third-Party Defendants.
Superior Court of New Jersey, Appellate Division.
Argued April 4, 2000.
Decided August 11, 2000.
*1258 Edward Seglias of the Pennsylvania bar, admitted pro hac vice, Philadelphia, PA, argued the cause for appellant (Cohen, Seglias, Pallas & Greenhall, attorneys; Mr. Seglias, of counsel; Janet L. Treiman, on the brief).
Jeffrey A. Less, Philadelphia, PA, argued the cause for respondent (Bazelon Less & Feldman, attorneys; Mr. Less and Lisa A. Barton, on the brief).
Before Judges SKILLMAN, D'ANNUNZIO and NEWMAN.
*1257 The opinion of the court was delivered by SKILLMAN, P.J.A.D.
The primary issue presented by this appeal is whether a surety which issues a statutorily mandated performance bond for a public construction project may establish preconditions for the filing of a claim under the bond that are not contained in the bond form prescribed by N.J.S.A. 2A:44-147.
In 1993, plaintiff Gloucester City Board of Education (Board) solicited bids for the construction of a new elementary school. The instructions to all bidders included a provision which stated in part:
Each successful bidder shall be required to furnish a performance bond in the amount of 100% of the contract sum. The bond shall be on a form furnished by the Architect (Document 00600) or may be a State Statutory Form.
The bid solicitation included another provision which stated that each bidder must submit "[a] Certificate (Consent of Surety) as per N.J.S.A. 18A:18A-25, from Surety Company stating that it will provide the Bidder, if successful[,] with a Performance Bond in the sum of the Contract[.]"
J & L Associates (J & L) submitted the successful bid for the plumbing work for the new elementary school. J & L's bid submission included an "Agreement of Surety," executed by General Accident Insurance Company of America (General Accident), which stated that "the undersigned Surety will provide [a] contract performance... bond[ ] as required by the specifications in the full amount of the contract price."
Defendant Burris Construction Company (Burris) was the successful bidder for the general construction contract. Prime contracts also were awarded to four other contractors.
The Board and J & L executed a contract for the plumbing work, which provided that the work was to commence on November 8, 1993, and be substantially completed by July 1, 1995. Subsequently, J & L submitted a performance bond, dated January 12, 1994, which was executed by defendant Amwest Surety Insurance Company (Amwest) rather than by General Accident.[1]
*1259 Paragraph one of the Amwest performance bond states:
The Contractor and the Surety, jointly and severally, bind themselves ... to the Owner for the performance of the Construction Contract, which is incorporated herein by reference.
Paragraph three states in pertinent part:
[T]he Surety's obligation under this Bond shall arise after:
....
The Owner has declared a Contractor Default and formally terminated the Contractor's right to complete the contract.
Paragraph nine states in pertinent part:
Any proceeding ... shall be instituted within six months after Contractor Default or within six months after the Contractor ceased working or within six months after the Surety refused or fails to perform its obligations under this Bond, whichever occurs first.
The Board notified J & L and Amwest at various times during 1994 and 1995 that J & L was not performing the plumbing work in accordance with the contract, and that the Board was considering declaring a contract default. On August 10, 1994, the Board's architect for the project sent a letter to J & L, with a copy to Amwest, which stated that J & L had been "repeatedly notified" that it had made "inadequate progress due to a lack of sufficient manpower on the project," resulting in construction delays of approximately six weeks. On December 19, 1994, the architect sent another letter to J & L, with a copy to Amwest, which stated that the project was "at least eight weeks behind schedule because of J & L's lack of performance," and that J & L was being put on notice of the Board's intention to terminate the contract. On December 28, 1994, the Board's counsel sent a letter to Amwest and J & L, stating that the Board was considering declaring a contract default and requesting a conference.
More than a year later, on April 2, 1996, the Board sent a letter to J & L and Amwest, which stated in part:
This is to give you notice pursuant to paragraph 3.1 of the performance bond that the Gloucester City Board of Education is considering declaring a contract default under its agreement with J & L....
Pursuant to paragraph 3.1, the Board requests a conference with the two of you within 15 days after you receive this notice to discuss methods of performing the construction contract.
Thereafter, J & L declared bankruptcy.
On February 5, 1997, the Board sent a letter to Amwest's counsel, which stated in part:
Gloucester City has been notified that [other contractors] ... intend to submit claims to Gloucester City for damages resulting from [J & L's] inadequate and incomplete performance on the Project. As a result, I am hereby putting [Amwest] on notice that as obligee, Gloucester City intends to assert a claim under the bond for all claims asserted against Gloucester City which are attributable to J & L's inadequate and incomplete performance on the Project.
On August 15, 1997, Burris filed a Demand for Arbitration against the Board for claims related to delays in the construction of the elementary school.
On July 16, 1998, the Board filed a Demand for Arbitration against Amwest for J & L's delays in the performance of the plumbing contract. However, Amwest refused to participate in the arbitration.
As a result, the Board filed this action to compel Amwest to participate in the Burris arbitration. The Board named as defendants not only Amwest but also Burris and the American Arbitration Association (AAA). Amwest filed a counterclaim seeking a declaration that it was not required to arbitrate. Burris filed a cross-claim against Amwest, a counterclaim *1260 against the Board and a third-party complaint against J & L.
The matter was brought before the trial court by Amwest's motion to dismiss the third-party claims against Amwest and J & L and bar arbitration of those claims, and the Board's cross-motion to compel Amwest to participate in the Burris arbitration. After argument, the court entered an order denying the Board's motion to compel Amwest to participate in the Burris arbitration, but leaving open the question whether the Board could compel Amwest to arbitrate in a separate arbitration proceeding.
Amwest subsequently moved for summary judgment, asserting that it had no obligation to the Board under the performance bond because the Board had not satisfied the preconditions for filing a lawsuit set forth in paragraphs three and nine of the Amwest bond. The trial court granted the motion and entered an order declaring that Amwest had no obligation under the performance bond because (1) the Board did not declare a contract default and formally terminate J & L's right to complete the contract, as required by paragraph three of the bond; and (2) the Board did not institute proceedings against Amwest within the time period required by paragraph nine of the bond. The Board subsequently filed a motion for reconsideration, which the court denied.[2]
On appeal, the Board argues that the trial court erred in not requiring Amwest to submit the question of the arbitrability of its defenses under the performance bond to arbitration. In the alternative, the Board argues that the court erred in concluding that those defenses are not arbitrable. Finally, the Board argues that the court erred in concluding that the Board is barred from pursuing its claims against Amwest because it failed to comply with the preconditions for filing a claim under the bond. In its answering brief, Amwest argues that the Board's appeal should be dismissed as interlocutory, because the summary judgment in its favor did not dispose of all claims in the action.
We conclude that even though this appeal is interlocutory, leave to appeal should be granted in the interest of justice. We also conclude that the trial court correctly determined that the arbitrability of Amwest's defenses under its performance bond was a question for the court rather than an arbitrator to decide and that those defenses are not arbitrable. However, the trial court erred in concluding that the Board is barred from enforcing the performance bond against Amwest because the Board failed to satisfy the preconditions for filing a claim set forth in paragraphs three and nine.

I
Amwest argues that this appeal should be dismissed as interlocutory because Burris' claims and cross-claims have not been decided. Amwest correctly notes that only a final judgment is appealable as of right, R. 2:2-3(a), and that a judgment must dispose of all claims by all parties to be final. See Kattoura v. Patel, 262 N.J.Super. 34, 40, 619 A.2d 1031 (App.Div. 1993). Consequently, Burris' outstanding claims preclude the Board from appealing the summary judgment in favor of Amwest as of right. However, when a timely notice of appeal has been filed, this court may grant leave to appeal from an interlocutory order nunc pro tunc. R. 2:4-4(b)(2).
The present appeal provides an appropriate occasion for invoking this power. "When an appeal [from an interlocutory order] has been improvidently filed, a respondent has a responsibility to the *1261 court to file a timely motion to dismiss the appeal." Miller v. Passaic Valley Water Comm'n, 259 N.J.Super. 1, 9, 611 A.2d 128 (App.Div.), certif. denied, 130 N.J. 601, 617 A.2d 1222 (1992). Amwest failed to file a motion to dismiss, and the appeal has now been fully briefed and argued. Moreover, this appeal involves a claim by a governmental agency for recovery of substantial losses allegedly incurred as a result of a contractor's failure to perform a public construction project. In addition, it appears doubtful whether Burris ultimately will pursue its claims within the framework of this litigation. Therefore, the interest of justice will be served by granting leave to appeal. See R. 2:2-4.

II
The threshold question in this appeal is whether the arbitrability of Amwest's defenses to the Board's claims under the performance bond should have been submitted to arbitration.
"In the absence of an express contract provision conferring authority on the arbitrator, it is uniquely within the province of the courts, and not arbitrators, to make the initial and threshold determination regarding the arbitrability of a particular issue." Laborers' Local Union Nos. 472 & 172 v. Interstate Curb & Sidewalk, 90 N.J. 456, 463, 448 A.2d 980 (1982). "The rationale for this rule is that because a party may be compelled to submit a dispute to arbitration only if it has agreed to this alternative form of dispute resolution, the question whether a contract requires a particular dispute to be submitted to arbitrationsometimes referred to as `substantive arbitrability,'is `an issue for judicial determination.'" Commerce Bank, N.A. v. DiMaria Constr., Inc., 300 N.J.Super. 9, 14, 692 A.2d 54 (App.Div.) (citations omitted), certif. denied, 151 N.J. 73, 697 A.2d 546 (1997), cert. denied, 522 U.S. 1116, 118 S.Ct. 1053, 140 L.Ed.2d 116 (1998).
This case involves a question as to "whether a contract requires a particular dispute to be submitted to arbitration." Ibid. The Amwest performance bond does not contain an arbitration clause. However, section 4.5.1 of the construction contract executed by J & L provides that "[a]ny controversy or Claim arising out of or related to the Contract, or the breach thereof, shall be settled by arbitration...," and paragraph one of the Amwest performance bond provides that "the Construction Contract ... is incorporated herein by reference." The Board argues that as a result of the wholesale incorporation of the construction contract into the performance bond, the mandate of section 4.5.1 that "any controversy ... arising out of or related to the Contract" shall be submitted to arbitration includes a "controversy" concerning the enforceability of Amwest's defenses to the Board's claim under the performance bond. Whatever the merits of this argument, it clearly presents a question of substantive arbitrability: that is, whether the performance bond incorporates the arbitration clause of the construction contract and, if so, whether the issues subject to arbitration under that clause includes the defenses to enforcement of the performance bond raised by Amwest.
The Board suggests that this case involves issues of "procedural arbitrability," which ordinarily are subject to arbitration, because Amwest's defenses are procedural in nature, that is, that the Board is foreclosed from enforcing the bond because it did not declare J & L in default and forcibly terminate the contract or initiate any proceedings against Amwest within the time allowed under the bond. See Commerce Bank, N.A. v. DiMaria Constr., Inc., supra, 300 N.J.Super. at 14-15, 692 A.2d 54. However, this argument begs the question. To be sure, if it were determined that the Board's claims against Amwest, and any defenses the bond provides to these claims, are arbitrable, then any question as to whether the Board had properly invoked arbitration would be *1262 within the province of the arbitrator to decide. See ibid. However, the question whether Amwest is subject to the arbitration clause contained in the construction contract and, if so, the scope of the duty to arbitrate which that clause imposes upon Amwest, must first be decided by the courts.

III
We turn next to the question whether the issue of the enforceability of Amwest's defenses to the Board's claims under the performance bond is arbitrable.
The Board relies upon a line of cases which hold that if a performance bond incorporates by reference the contract it secures, and that contract requires arbitration of any dispute arising thereunder, then a claim under the performance bond must be submitted to arbitration. See, e.g., United States Fidelity & Guar. Co. v. West Point Constr. Co., 837 F.2d 1507 (11th Cir.1988); Exchange Mut. Ins. Co. v. Haskell Co., 742 F.2d 274 (6th Cir. 1984); Compania Espanola de Petroleos v. Nereus Shipping, 527 F.2d 966, 973-74 (2d Cir.1975), cert. denied, 426 U.S. 936, 96 S.Ct. 2650, 49 L.Ed.2d 387 (1976); Boys Club of San Fernando Valley, Inc. v. Fidelity & Deposit Co., 6 Cal.App.4th 1266, 8 Cal.Rptr.2d 587, 589-90 (1992). The essential rationale of these cases is that the intent of an arbitration clause in the underlying contract is to require the submission to arbitration of any dispute concerning the adequacy of the contractor's performance, and when a performance bond incorporates the terms of contract by reference, it constitutes an agreement by the surety to stand in the shoes of the principal in the event a claim is made under the bond, and to arbitrate any issue concerning the principal's performance of the contract.
However, the issue which the Board seeks to submit to arbitration does not involve J & L's performance of the plumbing contract containing the arbitration clause. Instead, it involves the enforceability of provisions of Amwest's performance bond which purport to impose preconditions upon the Board's assertion of a claim under the bond. Thus, the issue the Board seeks to arbitrate does not involve a claim under the Board's underlying construction contract with J & L, but instead involves the enforceability of certain terms of the Amwest performance bond, which contains no provision for arbitration.
In Fidelity & Deposit Co. v. Parsons & Whittemore Contractors Corp., 48 N.Y.2d 127, 421 N.Y.S.2d 869, 397 N.E.2d 380 (1979), the New York Court of Appeals recognized that there is a distinction between requiring a surety that has executed a bond for performance of a construction contract containing an arbitration clause to arbitrate disputes concerning performance of the contract, and requiring the surety to arbitrate disputes concerning the enforceability of its performance bond. As in this case, the underlying construction contract in Parsons & Whittemore required the submission to arbitration of "[a]ll disputes arising out of this Contract, its interpretation, performance or breach." Id. at 381. Although the performance bond executed by the surety for a subcontractor did not contain any provision for arbitration, the general contractor attempted to compel the surety to arbitrate disputes "as to the liability of the surety company under the terms of its performance bond." Id. at 382. However, the court concluded that the surety was only required to arbitrate disputes concerning performance under the underlying construction contract:
A critical distinction must be drawn between disputes arising under the subcontract between [the general contractor] and [subcontractor] ... and possible unrelated differences which may arise between [the surety] and [general contractor] as to the liability of the surety company under the terms of its performance bond....
As to disputes between the general contractor and the subcontractor concerning failure of performance by the *1263 latter, those two parties expressly agreed that their differences should be submitted to arbitration for resolution. By contrast, there was no agreement on the part of any party that controversies arising as to rights and obligations under the terms of the performance bond would be submitted to arbitration.
....
[T]here is no language in the performance bond on which to base any argument that [the surety] was obligated to submit disputes arising under its performance bond (as distinguished from disputes arising under the subcontract) to resolution by arbitration. The arbitration clause in the subcontract provided only for arbitration of disputes arising under that contract.

[Ibid.]
Contra Hoffman v. Fidelity & Deposit Co., 734 F.Supp. 192, 195 (D.N.J.1990).
We adopt the New York Court of Appeals' reasoning in Parsons & Whittemore. Accordingly, we conclude that by incorporating J & L's contract with the Board, which included an agreement to arbitrate disputes arising thereunder, into its performance bond, Amwest reasonably can be held to have agreed to arbitrate any dispute J & L would have been required to arbitrate. However, the dispute between Amwest and the Board concerning the enforceability of the terms of the performance bond does not constitute a "controversy or claim arising out of or related to" J & L's contract with the Board and thus is not arbitrable.

IV
Finally, we turn to Amwest's argument that it is not liable under the performance bond because (1) the Board did not declare a default and formally terminate J & L's right to complete the contract as required by paragraph three of the bond; and (2) the Board did not institute proceedings against Amwest within the time period allowed under paragraph nine of the bond.
The terms of the performance bond required for a public construction contract in this State are prescribed by statute. In 1993, when the Board requested bids for construction of the new elementary school, N.J.S.A. 2A:44-143(a)(1) provided in pertinent part that "[w]hen public buildings ... are about to be constructed ... at the expense of ... any ... school district ..., the board ... contracting on behalf of the... school district, ... shall require the usual bond, as provided for by law...." N.J.S.A. 2A:44-147 provided that a performance bond for a public construction contract "shall be in substantially the ... form" set forth thereunder.[3] This form stated that the contract entered into by the principal "is made a part of this the bond the same as though set forth herein[.]" Ibid. It further stated that "if the [principal] shall well and faithfully do and perform the things agreed by [the principal]... according to the terms of said contract, ... then this obligation shall be void; otherwise the same shall remain in full force and effect[.]" Ibid. In addition, the form stated that "[t]he said surety hereby stipulates and agrees that no modifications, omissions or additions in or to the terms of the said contract or in or to the plans or specifications therefor shall in anywise affect the obligation of said surety on its bond." Ibid.
The bid documents for the contracts for construction of the new elementary school in Gloucester City stated that "the bond shall be on a form furnished by the Architect (Document 00600) or may be a State statutory form." Document 00600 stated, under the heading "Form of Performance Bond," that "[t]he Contract requires the Form of the `Performance Bonds' to be an *1264 executed form which appears on the following two pages." The language on those two pages essentially tracked the language of N.J.S.A. 2A:44-147, and also included a paragraph which stated that the bond is "given in compliance with [N.J.S.A. 2A:44-143 to -147]."
In accordance with these provisions, J & L's bid for the plumbing work included an "Agreement of Surety," executed by General Accident, which agreed to "provide [a] contract performance ... bond[ ] as required by the specifications in the full amount of the contract price." However, after J & L was awarded the plumbing contract and commenced performance, it submitted a performance bond executed by Amwest, which was not in the form provided by N.J.S.A. 2A:44-147 and the bid documents, but rather Amwest's own bond form.
As previously indicated, the Amwest bond form includes paragraph three, which states in pertinent part:
[T]he Surety's obligation under this Bond shall arise after:
....
The owner has declared a Contractor Default and formally terminated the Contractor's right to complete the contract.
It also includes paragraph nine, which states in pertinent part:
Any proceeding ... shall be instituted within six months after Contractor Default or within six months after the Contractor ceased working or within six months after the Surety refused or fails to perform its obligations under this Bond, whichever occurs first.
The question is whether Amwest can rely upon the provisions of paragraphs three and nine of its bond form as defenses to the Board's claim under the performance bond for the J & L contract, even though those provisions are not included in the performance bond form prescribed by N.J.S.A. 2A:44-147 or the bid documents.
In our view, the answer to the question may be derived from the principle that when a surety bond is issued to satisfy the requirements of a statute, the bond will be construed in conformity with the legislative mandate. See Cruz-Mendez v. ISU/Ins. Servs., 156 N.J. 556, 572, 722 A.2d 515 (1999); 11 Couch on Insurance, § 163:39 at 55 (3d ed. 1998) ("[W]here a statute prescribes the form of bond to be given by a public contractor, any bond given by the contractor must be interpreted as though its provisions conformed to the statutory requirements, whether they in fact do so or not."). Consequently, "[w]hatever is included in the bond, and is not required by the law, must be read out of it...." United States Fidelity & Guar. Co. v. Christoffel, 115 Ariz. 507, 566 P.2d 308, 310 (Ct.App.1971); see also Wichita Sheet Metal Supply, Inc. v. Dahlstrom & Ferrell Constr. Co., 246 Kan. 557, 792 P.2d 1043, 1046 (1990) ("[W]hen a statute requires a bond to be given, the statutory terms and conditions will be read into the bond and conditions not required by statute will be stricken from the bond as surplusage."); 9 John A. Appleman & Jean Appleman, Insurance Law and Practice § 5277 (rev. ed. 1981) ("The provisions of a statute pursuant to which a bond is given are to be read into the bond and considered a part of it, and conditions in the bond repugnant thereto are treated as mere surplusage.").
Applying these principles, if the form of performance bond prescribed by N.J.S.A. 2A:44-147 and the bid documents included a specific provision concerning the time within which a claim must be presented or other preconditions to filing a claim, then the N.J.S.A. 2A:44-147 form would clearly prevail over any contrary provision in the Amwest bond form. Or if the statutorily mandated bond form explicitly stated that the surety's obligations could not be qualified by any preconditions to the filing of a claim, that legislative directive would override paragraphs three and nine of the Amwest bond form. But Amwest argues that because N.J.S.A. 2A:44-147 does not *1265 explicitly bar a surety from imposing a limitations period or other preconditions to the filing of a claim, Amwest's bond form does not conflict with the statute.
Even though N.J.S.A. 2A:44-147 and the bid documents do not explicitly prohibit a surety under the required performance bond from conditioning its obligations on the contracting agency declaring a default and formally terminating the contract or filing suit on the bond within a specified period of time, we conclude that this prohibition is implicit in both the statute and bid documents. N.J.S.A. 2A:44-147 states that a performance bond "shall be in substantially the ... form" set forth thereunder, and the bid documents state that "[t]he contract requires the Form of the `Performance Bonds' to be an executed form" set forth therein, which tracked the language of N.J.S.A. 2A:44-147. This statutorily mandated form does not contain any language that remotely resembles the language of paragraphs three and nine of the Amwest bond form, or that authorizes the imposition of any preconditions to the filing of a claim. Moreover, the required bond form states that if the principal does not "well and faithfully do and perform" the contract, the surety's obligations "shall remain in full force and effect." In addition, N.J.S.A. 2A:44-143(b) provides: "Nothing herein shall relieve the surety's obligation to guarantee the contractor's performance of all conditions of the contract." Thus, the thrust of these statutory provisions is to impose an unqualified obligation upon the surety to guarantee the principal's performance.
It is clear that had J & L remained solvent, the Board could have brought suit for breach of contract without first declaring a default and terminating the contract, and that J & L would have remained subject to suit for the full ten-year period provided by N.J.S.A. 2A:14-1.2. In our view, the intent of N.J.S.A. 2A:44-143 and -147 is to require the surety to stand in the shoes of a defaulting principal and to be subject to any claim for which the principal would have been liable. However, if Amwest were allowed to condition its liability upon the Board satisfying preconditions of suit that could not have been asserted by J & L, this would dilute the protection the statutory bond is supposed to provide the Board and the public it serves. Therefore, we conclude that a surety may not condition its obligation under a performance bond issued to comply with the requirements of N.J.S.A. 2A:44-147 by requiring the contracting agency to declare a default and formally terminate the contract or to file a claim within a specified period of time.
This conclusion is reinforced by the fact that N.J.S.A. 2A:44-146 imposes a one-year limitations period on the filing of an action on the required bond for the payment of laborers and suppliers, but the statute does not impose any limitations period on the filing of a claim under a performance bond. The absence of such a limitations provision in the statutory sections governing performance bonds would seem to indicate that the Legislature contemplated that a surety which guarantees a contractor's performance would be subject to suit for the same period of time and under the same conditions as its principal.
Moreover, there is no irreconcilable inconsistency between the Amwest bond form and the statutorily prescribed form of performance bond, because the Amwest bond form contains provisions mandating conformity with the legal requirements of the jurisdiction in which a bond is issued. In addition to the previously quoted parts of paragraphs three and nine relied upon by Amwest, the second sentence of paragraph nine states:
If the provisions of this Paragraph are void or prohibited by law, the minimum period of limitation available to sureties as a defense in the jurisdiction of the suit shall be applicable.
In addition, paragraph eleven states:
When this Bond has been furnished to comply with a statutory or other legal *1266 requirement in the location where the construction was to be performed, any provision in this Bond conflicting with said statutory or other legal requirement shall be deemed incorporated herein.
N.J.S.A. 2A:44-143 to -147 and the bid documents clearly constitute "statutory or other legal requirement[s]" with which Amwest's bond was required to conform, and because paragraphs three and nine "conflict[ ] with" the unqualified guarantee of J & L's performance required under the statute and bid documents, those requirements must be "deemed [to be] incorporated" and thus to take precedence over any inconsistent provisions of the Amwest bond form.
Amwest argues that J & L's submission of the Amwest bond form constituted a "counter offer," which the Board "accepted" by "instructing J & L to proceed with the project." However, this was a competitively bid contract, and the submission of a performance bond in substantially the form provided by N.J.S.A. 2A:44-147 was one of the specifications of the bid proposal. Consequently, J & L had no right to negotiate a change in the terms after the contract was awarded. See Township of Hillside v. Sternin, 25 N.J. 317, 324-27, 136 A.2d 265 (1957); Gaglioti Contracting, Inc. v. City of Hoboken, 307 N.J.Super. 421, 432-35, 704 A.2d 1301 (App.Div.1997). Furthermore, when J & L submitted the Amwest bond form to the Board in January of 1994, the contract not only had been awarded, but the Board had already instructed J & L to commence work. In any event, in view of the second sentence of paragraph nine and paragraph eleven of the Amwest bond form, the Board could reasonably assume that Amwest's bond was intended to conform with the bid proposal rather than to impose new conditions upon the guarantee of J & L's performance.
Amwest also argues that its bid proposal complied with N.J.S.A. 2A:44-147 because its bond form was in "substantially the ... form" set forth thereunder. However, N.J.S.A. 2A:44-147 only authorizes a public agency to deviate from the language of N.J.S.A. 2A:44-147 in the form of performance bond it requires bidders to submit. It does not authorize a successful bidder to submit a performance bond in a different form than is set forth in the bid proposal, which is what J & L and Amwest attempted to do. In any event, if Amwest's guarantee of J & L's performance were qualified by the conditions of suit set forth in paragraphs three and nine of its bond form, this would constitute a substantial alteration in the required bond. Therefore, pursuant to paragraph eleven of the Amwest bond form, these conditions of suit must be deemed inoperative in order for the bond to conform with N.J.S.A. 2A:44-143 to -147 and the bid specifications.
Because we conclude that Amwest's guarantee of J & L's performance of its contract with the Board was not qualified by the conditions of suit set forth in paragraphs three and nine of Amwest's bond form, there is no need for us to consider the Board's alternative argument that those conditions are unreasonable and violate public policy.
Accordingly, the summary judgment in favor of Amwest is reversed and the case is remanded to the trial court for further proceedings in conformity with this opinion.
NOTES
[1] The record does not indicate why Amwest was substituted for General Accident as the surety on the performance bond.
[2] Amwest argues that the Board improperly presented new facts and arguments in support of this motion which it should have presented in opposition to the motion for summary judgment. However, we are satisfied that the motion for reconsideration was proper, and that Amwest will not be prejudiced by this court considering all of the factual materials and arguments presented in support of the motion.
[3] N.J.S.A. 2A:44-143 and N.J.S.A. 2A:44-147 were amended subsequent to the award of the J & L contract and the issuance of the Amwest performance bond. L. 1995, c. 38, § 2; L. 1995, c. 384, § 1; L. 1996, c. 81, § 2 (N.J.S.A. 2A:44-143); L. 1996, c. 81, § 6 (N.J.S.A. 2A:44-147). These amendments do not affect the issues presented in this appeal.